Filed 1/22/21  P. v. Rich CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>ALBERT EARL RICH,<br><br>        Defendant and Appellant. | A155040<br><br><br>(Alameda County<br>Super. Ct. No. 17CR017756) |

A jury convicted defendant Albert Earl Rich of 13 felony offenses involving human trafficking for commercial sex, torture, and various sexual offenses, including rape and sodomy.  The trial court sentenced him to 159 years to life in state prison.  Rich appeals, contending his convictions should be reversed because the prosecutor committed prejudicial misconduct by: (1) referring to two witnesses in opening statement who ultimately did not testify at trial; and (2) improperly asking a witness whether she was afraid to testify because Rich was a gang member and whether her husband had previously arrested Rich.  He further contends that remand is required to determine his ability to pay the fines and fees imposed by the trial court. Other than two sentencing modifications regarding the third and ninth counts, which the Attorney General concedes are error, we reject Rich's contentions and affirm the judgment as modified.

1

## I.    *The Charged Offenses*

The Alameda County District Attorney charged Rich with human trafficking for commercial sex (Pen. Code, § 236.1, subd. (b))[1] of Shante Doe between May 28, 2017, and June 5, 2017 (first count); forcible rape (§ 261, subd. (a)(2)) of Shante Doe on May 30, 2017, with enhancements for multiple victims (§§ 667.6, subd. (d), 667.61, subd. (c)), the same victim on separate occasions (§ 667.6, subds. (c) & (d)), and being on felony probation (§ 1203, subd. (k)) (second count); sodomy by force (§ 286, subd. (c)(2)(A)) of Shante Doe on June 2, 2017, with enhancements for multiple victims (§§ 667.6, subd. (d), 667.61, subd. (c)), the same victim on separate occasions (§ 667.6, subds. (c) & (d)), and being on felony probation (§ 1203, subd. (k)) (third count); forcible rape (§ 261, subd. (a)(2)) of Shante Doe on June 3, 2017, with enhancements for multiple victims (§§ 667.6, subd. (d), 667.61, subd. (c)), the same victim on separate occasions (§ 667.6, subds. (c) & (d)), and being on felony probation (§ 1203, subd. (k)) (fourth count); human trafficking of a minor for commercial sex (§ 236.1, subd. (c)(2)) of Mia Doe between May 22, 2017, and June 5, 2017, with an enhancement for being on felony probation (§ 1203, subd. (k)) (fifth count); kidnapping in order to commit a sex crime (§ 209, subd. (b)(1)) of Mia Doe on June 4, 2017, with an enhancement for being on felony probation (§ 1203, subd. (k)) (sixth count); forcible sexual penetration of minor Mia Doe (§ 289, subd. (a)(1)(C)) on June 4, 2017, with enhancements for kidnapping to commit a sex offense (§ 667.61, subd. (e)(1)), committing torture during a sex offense (§ 667.61, subd. (d)(3)), personally inflicting great bodily injury (§ 12022.7, subd. (a)) and for doing so during a sex offense (§§ 12022.53, subd. (d), 12022.7, 12022.8), committing a sex crime

---

[1] All further undesignated statutory references are to the Penal Code.

against a minor of age 14 to 17 (§ 667.61, subd. (n)), multiple victims (§§ 667.6, subd. (d), 667.61, subd. (c)), the same victim on separate occasions (§ 667.6, subds. (c) & (d)), and for being on felony probation (§ 1203, subd. (k)) (seventh count); forcible sexual penetration of minor Mia Doe (§ 289, subd. (a)(1)(C)) on June 4, 2017, with enhancements for committing a sex crime against a minor of age 14 to 17 (§ 667.61, subd. (n)), multiple victims (§ 667.6, subd. (d)), the same victim on separate occasions (§ 667.6, subds. (c) & (d)), and being on felony probation (§ 1203, subd. (k)) (eighth count); torture (§ 206) of Mia Doe on June 4, 2017, with an enhancement for being on felony probation (§ 1203, subd. (k)) (ninth count); human trafficking for commercial sex (§ 236.1, subd. (b)) of Tasha Doe between May 15, 2017, and May 31, 2017 (tenth count); forcible rape (§ 261, subd. (a)(2)) of Tasha Doe on May 29, 2017, with enhancements for multiple victims (§§ 667.6, subds. (c) & (d), 667.61, subd. (c)), the same victim on separate occasions (§ 667.6, subds. (c) & (d)), and being on felony probation (§ 1203, subd. (k)) (eleventh count); assault with a deadly weapon, a flatiron (§ 245, subd. (a)(1)), of Tasha Doe on May 28, 2017, with enhancements for causing great bodily injury (§ 12022.7, subd. (a)) and being on felony probation (§ 1203, subd. (k)) (twelfth count); and torture (§ 206) of Tasha Doe on May 28, 2017, with an enhancement for being on felony probation (§ 1203, subd. (k)) (thirteenth count).  It was further alleged that Rich had four prior felony convictions, one of which resulted in a prior prison term (§ 667.5, subd. (b)).

As originally charged, the case included two codefendants—Khalilah Barker and Sasha Coleman.  Coleman was charged with pimping (§ 266h, subd. (a) [fourteenth count]).  Barker was charged with human trafficking for commercial sex (§ 236.1, subd. (b)) (first and tenth counts), pimping (§ 266h,

3

subd. (a)) (fifteenth and seventeenth counts), and pandering (§ 266i, subd. (a)(2) [sixteenth and eighteenth counts]).

Before trial, Barker entered a plea agreement regarding multiple charges of human trafficking and pimping. During trial, upon the People's motion, the trial court dismissed the pimping charge against Coleman.

## II. *The Prosecution's Case*

Between May and June of 2017, Rich recruited two young women and one 17-year-old girl to work for him as sex workers.[2] During this span of time, the three victims were trafficked for commercial sex, raped, sodomized, tortured, and assaulted by Rich.

### A. *Tasha Doe is raped and burned with a flatiron.*

In or about May 2017, Tasha Doe moved to Oakland to work as a sex worker. Tasha had worked as a sex worker in San Diego and relocated to Oakland with her then pimp. Within a few days of working as a sex worker in Oakland, Tasha met Rich on an Internet dating site. At this point, Tasha was looking for a new place to stay and a way to return home. In their initial conversations, Tasha told Rich she needed help and was trying to return home. Rich said that he could help her, but he did not say what she would have to do in return.

When Tasha first met Rich in person, they talked for a couple of hours in his car about how he would help her return home. Tasha believed that Rich would help her. At one point, Rich pulled out a gun and showed it to her. Although the gun scared Tasha, she nevertheless stayed in the car for about two more hours and eventually fell asleep. When she woke up, she was

---

[2] Throughout this opinion we refer to "sex workers" and "sex work" in lieu of prostitutes and prostitution.

4

in a different location and Coleman and Barker were in the car with her. Tasha recognized Coleman and Barker as sex workers from the streets.

Rich then drove the girls to his mother's apartment. After Coleman and Barker went inside, Rich took Tasha to a stairwell, pulled down her pants and told her he wanted to have sex. Tasha said that she did not want to have sex, but Rich said he did not care. Rich put his penis in Tasha's vagina for 10 to 15 minutes. Tasha was both angry and scared. Rich then brought Tasha into his mother's apartment and told her that she would be sleeping on the floor with Barker and Coleman.

The next day, Rich moved the girls to a Motel 6 where they had two rooms, one of which Tasha shared with Coleman. Within a few days, Tasha met Mia Doe on International Boulevard, also known as "the track." Mia later went to the Motel 6 with Tasha and the other girls; Mia shared a room with Barker. From that point, Mia began working for Rich. Both Tasha and Mia experienced violence from Rich.

On one occasion, Rich became angry with Mia for texting with another man. Tasha saw Rich punching Mia in the face and stomach until Mia fell off the bed and cried. After being beaten, Mia had to go out and work as a sex worker.

On or about May 28, 2017, Rich became violent with Tasha after she called him a "bitch." Rich walked out of the room and slammed the door. At first, Tasha did not know what to think and was not afraid. However, Coleman and Barker returned to the room where Tasha was sitting and plugged in a flatiron. Twenty minutes later, Rich returned to the room and yelled at Tasha. He then started hitting and punching her. Tasha was crying and apologizing for calling Rich a name, but he yelled at her to stop crying, warning her that it would only make him more angry. Rich told

5

Tasha to stop playing him and taking him for a joke. After further punching Tasha, Rich grabbed her left arm, opened the flatiron, and put it on her arm for a couple of seconds. Tasha quickly yanked her arm back from the flatiron. She was in pain; her skin was burned and bubbled.

Tasha wrapped a towel around her burned arm and asked Rich for bandages. On or about May 29, 2017, Rich said he would take her to his mother's apartment to get bandages but, instead, drove her to his mother's apartment and raped her in the living room. Tasha's arm still hurt and was wrapped in a towel; she felt that she had no choice, so she did not resist Rich. Rich never obtained bandages for Tasha's burned arm. After raping her, Rich made Tasha go out and work as a sex worker.

Tasha felt Rich would punish her if she left and did not make money for him as a sex worker. On or about May 30, 2017, Tasha was able to escape when she was momentarily left alone in her room at the Motel 6. While everyone was in the other room, Tasha packed up her things and walked to International Boulevard. Tasha got a ride to the hospital, where she received medical attention for her arm. When Tasha explained what had happened to her, hospital staff called the police.

After talking to the police, Tasha received a bus ticket and was able to leave California. As she was leaving, Tasha received text messages from Rich saying: " '[W]here are you? Did you go to the hospital?' " " 'I Won't hurt you again, Boo.' " " 'Where you at, Boo?' " (*Sic.*) Tasha did not tell Rich her location; she did not return to California except to testify against Rich. Tasha's arm eventually healed. At the time of trial in 2018, Tasha still had a visible scar on her arm from the flatiron incident.

B.    *Minor Mia Doe is beaten and brutally tortured while being sexually assaulted.*

In May 2017, 17-year-old Mia Doe came to Oakland and started working as a sex worker on International Boulevard.  After a week or two, she met Barker, who said that Mia should work with her people.  Barker told Mia that she worked for a nice guy who gave her half the money, protected her, and gave her a place to stay.  Mia thought this sounded good, so Barker took her to meet Rich, who was nearby, sitting in his car.  Mia got in the car and had a "cool" conversation with Rich, but she did not tell him her real age.  Mia went back to work and gave Rich her money that night.  Rich then drove Mia, along with Barker, Coleman, and Tasha, to the Motel 6, where Mia shared a room with Barker.

The first violence Mia witnessed was when Rich burned Tasha with a flatiron.  Rich gathered up the girls and made them watch as he burned Tasha's arm.  Mia knew that Tasha had called Rich a "bitch" and this was Tasha's punishment.  Tasha screamed and cried, which made Mia afraid of Rich.  All of the girls, including Tasha, went out to work the next day.

The next violence happened when Mia and Coleman were hanging out in their room.  Mia was on the phone with a friend, a boy about her age, when Rich came into the room.  Rich asked who Mia was talking to on the phone.  When Mia said no one, Rich took her phone, called the boy and questioned him.  After he hung up, Rich began forcefully hitting Mia in the face with his hands.  When Mia fell down on the bed, Rich kneed her in the nose.  Mia was crying, hurt, and feeling disrespected after the beating.  Nevertheless, Mia went out to work as a sex worker that night.

In May 2017, Mia met Shante Doe on the track.  Shante initially spoke with Barker, who then brought her to meet Rich.  That night, Shante went to

7

the Motel 6 with Rich, Barker, Coleman, and Mia.[3]  After that, Shante worked as a sex worker with Barker, Coleman, and Mia, going from the Motel 6 to the track.  At some point, Rich moved Barker, Coleman, Mia, and Shante to an Americas Best Value Inn.

On or about June 4, 2017, Mia stayed overnight on a date and did not come back to the track.  Mia was scared and wanted to get away from Rich and Barker, so she did not respond to their phone calls and texts.  At some point, Mia talked to Barker, who convinced Mia that she would not be harmed if she returned.  Mia believed this was true, so she gave them her location.  When Mia got in the car, Rich and Barker began to question her about where she had been.  Mia said she fell asleep at a date's house.  Mia testified that she did not want to get in trouble for not answering her phone, so she lied to them and said she had gone to the hospital.  When Rich asked to see proof of her hospital visit, Mia said she did not have any papers because she had not been admitted.  The questions were starting to make Mia nervous.

When they parked at the motel, Mia "freak[ed] out" and tried to stay in the car because she was afraid something was going to happen to her.  Rich smiled and said he was not going to hurt Mia, so she got out of the car.  Rich grabbed her by the back of her neck with his hand and said something like, "Let's go."  Rich had an evil smile that made Mia think he was going to do something to her.  Mia was crying as Rich walked behind her and held both her arms; there was no way she could escape.

Rich brought Mia to a room where Coleman, Barker, and Shante were located.  He told her to sit in a chair.  He accused Mia of being with another pimp.  She denied it.  He told her to take off her clothes and her jewelry.  Rich

---

[3] That was the night Tasha escaped.

8

then told her to turn around. Standing behind her, Rich took a purse strap, put it around her neck, and choked her with such force that she could not breathe. He then pushed Mia onto the bed and punched her several times in the back and the head with his fists. She cried in pain, told him to stop, and asked why she was being treated that way. After Rich was done beating Mia on the bed, he put a deodorant can in Mia's face, told everybody to look at it, and laughed. Rich then started twisting the can into Mia's anus. Mia was screaming and yelling in pain. After Rich took the deodorant can out of Mia's anus, he threw it in the garbage.

Rich told Mia to get up and stand in the corner facing the wall. Rich took a break from beating Mia to eat some oysters. As he poured hot sauce on the oysters, he joked that they looked like Mia's butt. Rich said he should shove the hot sauce bottle up her butt. Rich said he could not see enough blood, so he had Coleman and the other girls turn on their flashlights on their phones, had Mia spread her buttocks, and then had everybody get close to look in Mia's anus.

At some point, Rich asked if the girls thought he should stop beating Mia. Nobody responded. Rich said, " 'I get hard when I see this type of shit.' " Rich got the deodorant can out of the garbage. He then pushed Mia against the wall and put the can inside her body a second time. He tried to get the whole can inside her anus. The force lifted her onto her tiptoes. Mia was screaming; Rich was pushing the can farther than he did the first time. Blood was dripping from Mia's anus. When Rich took the can out of Mia's anus, there was a lot of blood on it and blood was running down Mia's legs. Mia asked to go to the bathroom. Rich said she could go but not to close the door. Rich laughed as Mia moaned and groaned in pain. Rich told Mia to get

9

in the shower and clean herself up.  Her anus was bleeding, and it hurt to wash it.

Afterward, she got dressed and went to the track with the other girls. Mia had several dates that night even though it hurt to have sex.  She asked one date to take her to the hospital, but he refused.  She gave her money to Rich, who took her back to the motel.  Mia did not feel she could go to the police or ask Barker to take her to the hospital.

The next day, while Barker and Coleman were getting their nails done, Mia and Shante waited outside of the salon with Rich in his car. Unbeknownst to Mia, the police were on the way to their location after receiving a call from one of Shante's friends that Shante was being held captive.  Mia was initially detained by the police and later taken to the hospital.  At the hospital, Mia was told she was "ripped" and needed surgery to repair the damage.

Martin Moran, the physician assistant who examined Mia, testified that he observed injuries to Mia's head, neck, left ear, and left jaw, as well as redness and swelling in the vaginal area; there was a bleeding tear from her anus that was 2.5 centimeters long and went through all five layers of skin. He said the neck injury was consistent with choking and strangulation.  The rectal injury was the most severe he had seen in 21 years in the emergency room, and it was the first time he had to refer a sexual assault victim to surgery.

Following surgery, Mia was taken from the hospital and flown back home; Mia was put into a group home for girls who had been victims of human trafficking.  Mia had to wear diapers for four months after surgery; sometimes she saw blood in the diapers.  She needed medication for the pain and to help with her bowel movements.

C.	*Shante Doe is raped and sodomized.*

In May 2017, 20-year-old Shante Doe was working as a sex worker on International Boulevard when she was approached by Barker. Barker offered her a place to sleep. Barker said her "baby daddy" was there and that he could interview Shante; Shante knew he was a pimp. Barker said he was a little crazy, but only if you upset him. Barker and Shante walked up International Boulevard to Rich's car. Shante got in the car and had a short conversation with Rich. After talking with Rich, Shante met Coleman, Mia, and Tasha.

Rich, Barker, and Shante then retrieved Shante's belongings and brought them back to the Motel 6. Shante shared the room with Barker and Mia. The next morning, Rich was with all the girls in Barker's room, when Shante saw Rich acting "jittery" and "paranoid." Rich's demeanor made Shante nervous because he was so large. Shante texted a friend to pick her up but not that day because she wanted to make some more money. Shante tried to "play it cool" by joking about being picked up. Rich told Shante she was not going to get picked up and no one was leaving him.

That same afternoon, Shante, Tasha, and Mia walked together to International Boulevard to work as sex workers. Barker told Shante to give her the money after each date. Shante was always paired with somebody, usually Barker or Tasha. Shante was told to stay away from Coleman because she was "mean" and from Mia because she was "in her own world."

After a few days, Rich realized that Shante did not want to be there, so he always paired her with Barker or Coleman. Rich told Mia (through Barker) to stay away from Shante because she would try to make Mia leave. Barker was usually nearby telling the two girls to separate. Shante thought she would get in trouble with Rich if she and Mia were alone together.

11

Sometimes Shante saw Rich drive by on International Boulevard; it made her feel overwhelmed and terrified to have him watching her.

The first time Rich raped Shante was on or about May 30, 2017, after she had been standing on the track with Mia and Tasha. Mia left with a date, and Tasha wanted Shante to walk away with her. Rich told Tasha to walk by herself, so Tasha walked away. Shante was scared to be with Rich because she did not know if he would be upset. Rich grabbed Shante by the back of the neck with one hand and walked her to a metal fence near his car in a parking lot. Shante told Rich she was afraid of him. Rich told her to quit playing with him and to "give him some pussy." Shante said, " 'No.' " Rich pushed Shante and said, " 'You are going to do it.' " Shante did not feel that she could have walked away because Rich would have beaten her. Rich drove his car over and told her to get in the backseat. After she got in, he drove to the other side of the street and parked. Rich put a condom on his penis and moved to the backseat, where he began pushing the back of Shante's neck down like she was a dog and telling her to bend over. Rich was unable to get his whole "12 inches" inside her vagina, but he got at least the tip of his penis inside. After Rich raped her, Shante went back to work as a sex worker on the track. Later that night, Shante texted Rich that she was in pain. When Shante returned to the motel, she took a shower and saw blood as she washed herself; she later had spotting.

A few days later, on or about June 2, 2017, Rich ordered Shante to go with him to his mother's apartment. He parked his car in the underground parking garage and ordered her to take off her clothes. Shante said that she did not want to have sex. Rich pulled down her pants and forced his penis into her anus. Shante told Rich that it hurt. So, he then put his penis in her vagina. After 10 or 15 minutes, he drove Shante back to the Motel 6.

The third rape occurred on or about June 3, 2017, after Shante had been standing on International Boulevard. Rich drove up and ordered Shante to get in his car. Shante refused. He said, " 'Don't make me get out the car.' " (*Sic.*) Rich got out of the car; pushed Shante into the backseat; and said, " 'Just sit there.' " He drove to a school and parked. He got in the backseat and ripped off Shante's underwear. Shante was not cooperating and did not want to have sex with him. Rich told her, " 'You will be fine. You used to it, and you just bend over and cooperate.' " (*Sic.*) Shante squirmed as he tried to put his penis in her vagina. Rich told her that if she kept moving, he was going to put his penis in her butt. He got his penis into Shante's vagina and bit her "cheek." Shante just lay there, resigned to the fact that there was no point in fighting him.

On or about June 4, 2017, Mia stayed out all night. Rich said if he found Mia he was going to shoot her because she probably ran off and he should have somebody "beat her ass." When Rich and Barker returned to the motel with Mia, she was shaking and crying. Rich picked up the television remote and said he should shove it up Mia's butt, but it would not fit. Rich told Shante that she needed to get closer and watch because this is what could happen to her if she left. As Mia was trying to explain where she had been, Rich said, " 'Shut up, bitch,' " and threw the remote at Mia's face. Rich put a condom on Shante's deodorant spray can and told Mia to strip naked, which Mia did. Rich wrapped a sock around his hand before he beat Mia in the back and head.

After Rich was done beating Mia, he put the deodorant can in Mia's face, told everybody to look at it, and laughed. Rich then started twisting the can into Mia's anus. Mia was screaming and yelling in pain the likes of which Shante had never heard before. Shante was covering her ears and

13

cringing.  When Rich pulled the can out, there was blood on it.  Shante thought Rich had stuck it too far and was going to kill Mia.  Rich was laughing as he pulled the can out of Mia; he told everybody to look at it before he threw it away.

After he assaulted Mia, Rich looked at Shante and asked her if she had a problem and if she also wanted to leave.  Rich wanted to know why Shante looked so nervous and if she had anything to tell him.  Shante said "no," she did not have anything to tell him.  Rich reminded her about a time when Barker had been rubbing his feet, and Shante said that she would never rub a man's feet.  Rich said, " 'Remember when you said that you never rub my feet?  Well, bitch, get on your knees and rub my feet.' " (*Sic.*)  Frantic and crying, Shante rubbed his feet.

After the foot massage, Rich asked if the girls thought he should stop beating Mia and if she had had enough.  Nobody responded.  Rich got the can out of the garbage.  Mia was standing in the corner facing the wall and had no place to go.  Rich pushed her against the wall; said, " 'Don't move' "; and put the can in Mia for a second time.  He tried to get the whole can inside her anus and lifted her up onto her tiptoes in the process.  Blood was dripping from her anus.  When Rich took the can out of Mia's butt the second time, there was a lot of blood on it and on Mia's body.

Shante did not know what was going to happen next.  She did not know if Rich was finished or if he was just getting started and was going to beat Mia to death.  Rich seemed to think that Mia's leaving was connected to Shante, but Shante did not know where Mia had gone.

That night, all of the girls, including Mia, got dressed and went to work on the track.  Shante texted her friend Tiana to make arrangements for Tiana to come pick her up.  When Tiana texted back that she was going to

call the police, Shante told her, " 'Don't get involved. I'm going to find a way to get up out of here. Just pick me up.' " Sometime after texting Tiana, Shante was brought back to the motel. Shante could not sleep that night because she was afraid that Rich might kill her in her sleep.

The next morning, on June 5, 2017, everyone got into Rich's car in order for him to take Barker and Coleman to get their nails done. After dropping off Barker and Coleman at the salon, it was just Shante and Mia in the car with Rich. At some point, Rich got a phone call. During the call, Rich was looking at Shante and Mia. Shante froze, fearing that her friend had called the police. Rich asked the person on the phone to call the motel and get a description of the girl that the police were looking for. Shante overheard that the girl had piercings and tattoos. Shante knew they were talking about her as she had both piercings and tattoos. Mia, on the other hand, did not have any piercings or tattoos.

Shante knew she was in serious trouble because Rich thought she had snitched on him. Shante called Tiana and put her on speakerphone in front of Rich and asked her why she called the police. Rich snatched the phone out of Shante's hand and hung it up. Rich said that he had a place for Shante and that he knew how to treat "bitches" like her. Rich further threatened that he would "take care of" her. Shante tried to get out of the car but broke the door handle. When Rich got out to fix the door, Shante managed to break free and ran across the street to another nail shop. Shante broke into tears and told the people at the nail shop that Rich was coming for her. They got up, looked, and locked the door when they saw Rich coming across the street. Soon, Barker was outside the nail shop, shouting for the people to let Shante out. Rich and Barker kicked and banged at the door while they argued with the people in the salon. Rich threatened to shoot up the place if they did not

15

open the door.  Shante was crying and stayed in the nail shop until the police arrived.  Shante could see Mia outside; Shante told the officers not to arrest Mia and asked them to take her to the hospital because of what Rich had done to her the night before.

D.     *Barker acts as Rich's "bottom girl."*

Barker was 23 years old at the time of the trial.  She first became aware of who Rich was when she was 13 years old, when she was working as a sex worker for another pimp.  She knew Rich was a pimp.  Rich became Barker's pimp when she was 20 years old.  Initially, Barker thought Rich was a dangerous "guerilla [*sic*] pimp" who beat his girls, but he treated her really nicely when she was his only sex worker.  She felt special.  Barker thought she and Rich had a boyfriend–girlfriend relationship.

After a while they talked about how it would be easier for Barker if Rich had other girls, so Barker started picking out other girls and they grew their business.  When they brought in more girls, Barker became Rich's "bottom girl."  As Rich's bottom girl, Barker was the most trusted sex worker who handled the day-to-day operations.  She coordinated the girls, collected their money, made sure they had a place to stay, watched them, and made sure everybody was safe on the streets.

Barker was jealous of the other women who worked for Rich.  Rich became violent with Barker when she caused another sex worker to leave him.  Rich once choked Barker with his hands while she was standing on the track.  After choking her, Rich took Barker to his friend's house, wrapped an electrical cord around her neck, and started hitting and kicking her.  She could not breathe, fell to the floor, and had a seizure.

One night on the track, there was an argument about Rich's visiting other women.  Barker walked away from Rich to go to her mother's house.  Rich drove by Barker as she was walking and fired a bullet right past her

16

face. Rich told her to get in the car or he would not miss next time. Barker was scared and crying when she got into his car. Rich started hitting and punching her. He said, " 'Go ahead and try to leave.' " That night Rich beat Barker in the underground garage at his mother's apartment.

Barker tried to leave Rich many times, but he would catch her or sit outside her mother's house and wait for her, and then he would beat her. Rich knew when she went to her mother's house because she had a cell phone with a tracking application that let him know her location.

Despite the beatings, Barker loved Rich and had a tattoo that said " 'Rich money' " with a stack of $100 bills; the tattoo made her feel special because Rich was claiming her as his own. Barker wanted to be Rich's girlfriend, but it did not work out because she could not be Rich's only girl. When Coleman came to work for Rich, Barker became jealous when she found out they were having sex. Rich again beat Barker into a seizure.

Rich brought Tasha into their group to work with Barker and Coleman, even though neither wanted another girl around. A couple of days after Tasha started working with them, Mia joined their group and also began working for Rich.

On or about May 28, 2017, Rich gathered Barker, Coleman, Tasha, and Mia into one room. Tasha was naked, and Rich was angrily punching her and said, " 'So you like to call me a bitch.' " Rich picked up a hot flatiron and burned Tasha's arm with it. The skin on Tasha's arm blistered and became raised. Barker put a towel around Tasha's arm. Tasha did not go to the hospital, but she complained of pain in her arm when she worked that night.

Sometime after Tasha was burned, Shante joined the group after meeting Barker, Coleman, Mia, and Tasha on the track. Rich drove them all back to the Motel 6, where Shante shared a bed with Mia.

One day at the Motel 6, Barker told Rich that Mia was texting her old pimp. Rich told Barker to get Mia's phone and password. After Barker read the messages to Rich, he slapped Mia, phoned the man, put the call on the speakerphone, and beat Mia.

After Tasha left the group, Rich moved Barker, Coleman, Mia, and Shante to the Americas Best Value Inn. On or about June 4, 2017, Mia went on a date at about 2:00 a.m. but did not return to the track or answer her phone. After Mia had been found and brought back to the motel, Rich forced Barker and the other girls to watch as he shoved the deodorant can into Mia's anus. He said that the girls were "going to learn not to play with him." At one point, Rich asked if everybody thought Mia had had enough, but nobody responded. Rich shoved the can in Mia's anus again. She screamed and slid down the wall. Rich told her to get in the shower. The girls all went to the track that night and worked.

The next morning, on June 5, 2017, Rich asked what they wanted to do. The girls requested that Rich take Mia to the hospital, get Shante an outfit, and take Barker and Coleman to get their nails done. Everybody got in the car. Rich dropped off Barker and Coleman at the salon. Later, the desk clerk at the motel called Barker and said not to come back to the motel because the police were there. Barker phoned Rich and told him the police were looking for a woman with facial piercings who had been kidnapped. Rich said he thought it was Mia. Barker said it was not Mia because she did not have piercings. Coleman agreed and said it was Shante. Barker came out of the nail shop and saw Shante run across the street to another nail shop. At the other nail shop, they locked the door so that Rich and Barker could not get inside. The police soon arrived.

18

While Barker was in custody, she entered into a plea agreement that required her to testify truthfully. Barker and Coleman were both in custody. After Coleman told other inmates that Barker was a snitch, they assaulted Barker. One day while at the courthouse, Rich made gunshot sounds and told Barker that he knew where her mother lived.

E. *Police Investigation*

On June 5, 2017, Oakland police officers went to the Americas Best Value Inn to investigate a report that a woman's friend was being held against her will in a room near the washroom. The desk clerk gave officers the key to room 115, which was found to be unoccupied but contained a lot of women's clothing. After leaving room 115 locked and secure, the officers received a second dispatch indicating that the reporting party was in a car nearby and had received text messages from her friend. The officers met the reporting party and proceeded with emergency lights and sirens to a nail shop where other officers had already detained Rich. At the time of his arrest, Rich was six feet six inches tall, weighed 320 pounds, and had $1,200 in his jeans pocket.

Following a search of room 115 at the Americas Best Value Inn, police found in the trash a metal can with red streaks of apparent blood on it. Police also found a used condom and a pair of men's jeans, size "46 by 34."

F. *Human Trafficking and Commercial Sex*

Holly Joshi testified as an expert in commercial exploitation, sexual exploitation, pimping, pandering, and the relationships between victims and traffickers. Human trafficking means the deprivation of personal liberties by forcing another person to sell sex or engage in forced labor.

A pimp typically has a " 'stable,' " a street term for a group of girls working for him as sex workers. His most trusted girl is known as "the

19

bottom," who is entrusted with collecting the other girls' money, enforcing the pimp's rules, and reporting back to the pimp.

"Guerilla pimps" are human traffickers who force their girls to sell sex and often kidnap them off the street, rape them, and take control of them. Guerilla pimps use violence and threats of violence to control when and what their girls eat, as well as when and if they are allowed to sleep. Sleep deprivation is a common tactic. They monitor their girls' phones. They use guns by brandishing, shooting, and pistol-whipping. They use whatever household items are available, such as bottles, curling irons, and chairs, to punish girls who do not follow their rules. They make their other girls watch the punishment. Girls who follow the pimp's rules may be rewarded by having the pimp's name tattooed on their bodies as a psychological reminder that they are the pimp's property. The guerilla pimp plays the girls against each other because he is outnumbered and needs to ensure the girls will not work against him or leave him.

Victims of guerilla pimps generally do not seek help from the police because pimps tell their girls not to trust law enforcement. They are convinced they will be arrested for being sex workers. The girls also do not want to be labeled as snitches because that would have severe consequences for them.

Joshi was given three hypothetical fact situations that generally described the evidence regarding Tasha Doe, Mia Doe, and Shante Doe. In her opinion, each of the three scenarios described human trafficking by a guerilla pimp.

## III. *The Defense's Case*

The defense rested without calling any witnesses.

20

## I. *The prosecutor did not engage in prejudicial misconduct.*

Rich contends his convictions should be reversed because the cumulative effect of two prosecutorial errors deprived him of a fair trial. Rich argues that the prosecutor erred by referring to two witnesses during opening statement who ultimately did not testify at trial. He further contends the prosecutor improperly asked a witness questions to insinuate that Rich was a gang member and that he had been previously arrested by the witness's husband. According to Rich, the cumulative effect of this conduct made him "appear worse in the eyes of the jury than was warranted by the evidence presented." We disagree.

### A. *Background*

#### 1. The Prosecutor's Opening Statement

Before trial, the court granted the prosecutor's motion to call witnesses Tiffany Doe and Maxine Doe regarding Rich's prior uncharged conduct.

During her April 30, 2018 opening statement, the prosecutor informed the jurors of the expected testimony of her witnesses, including Tiffany Doe and Maxine Doe. The prosecutor transitioned to the expected testimony of Tiffany Doe by explaining about Rich's branding his girls: "This is Khalilah [Barker] in custody. And when I met with her and she gave a complete statement, I asked her about brands and tattoos, and she said yes, that the defendant told her she was going to get the name Rich and money and dollar bills tattooed on her body. The only choice that she had in the matter is where on her body it went. [¶] But this is not the first time that a woman has been branded by the defendant. And this is a closer picture of the tattoo. [¶] You will hear testimony from Tiffany Doe. [¶] Before Khalilah started working for the defendant, there was a young woman between 2009 and 2010

who worked as a [sex worker] for the defendant. In that booking photo you see a plastic wrap on her neck because it is a fresh tattoo, and it says 'Al'. [¶] Tiffany will tell you that, again, there was no leaving him. She had a criminal protective order that prevented him from having any contact with her. It did not make a difference."

The prosecutor also summarized the expected testimony of Maxine Doe: "You will also hear testimony from Maxine Doe, who, in November of 2014, was walking on International Boulevard trying to get back to her grandmother's house in Richmond. She was 16 years old. And she will tell you that the defendant drove up to her and said, 'Hey, you don't look like you should be out here.' [¶] She had bags of clothes with her. And she said, 'I am just trying to get to the BART station.' [¶] And he said, 'Well, I will take you.' [¶] And she said, 'Are you a pimp?' [¶] He says, 'No, I'm not a pimp. You can trust me,' and she gets into the vehicle. [¶] And as soon as she gets in, he locks the doors, and he says, 'Of course I'm a pimp. I dare you to touch that door.' And he motioned to his waist as though he had a gun. [¶] He then took her to an apartment and brutally raped her. After that rape, he said, 'You know what? I have a heart. I am going to take you to International.' And he drove her to International Boulevard and pointed out that this is what he does. He turns girls into hoes. [¶] And she begged and pled and said, 'I'm only 16.' [¶] And he said, 'You don't have a body of a 16-year-old.' [¶] And through tears and begging and pleading, he finally allowed her to leave."

On May 9, 2018, outside of the presence of the jury, the prosecutor advised the court and defense counsel that Maxine Doe would not be appearing to testify that day as had been previously arranged. The prosecutor explained that she had met with Maxine Doe on several occasions. The prosecutor indicated that Maxine Doe was more than eight months

pregnant but was expected to be available to testify the following day. On May 10, without the presence of the jury, the prosecutor explained that Maxine Doe would again not be appearing in court. The prosecutor reported that Maxine Doe was having complications from her pregnancy and was taken to the hospital by ambulance on an emergency basis. The prosecutor also reported that Tiffany Doe was not being cooperative, was extremely fearful of Rich, and had not made herself available. Tiffany Doe was believed to be out of state.

### 2. The Prosecutor's Questioning of Theresa Thurston

On May 10, 2018, the prosecutor called Theresa Thurston. Thurston testified that she was in the nail shop when a young girl ran in, but she claimed not to remember what she told police officers about the incident. Thurston claimed that her failure to remember began before she talked to the prosecutor and before she was served with a subpoena. When asked if she expressed fear for her safety because she was testifying, she said, "No." Thurston said the only fear she had was of being put in jail if she failed to appear. The prosecutor then asked, "Did you express fear that the defendant in this case may be involved in a gang?" Thurston said, "No." There was no defense objection.

Thurston admitted that she had refused to talk to the prosecutor's inspector, declined to further speak with the police, and directed that all communications should go through her husband. When questioned in detail about the statement she gave to the police, she claimed not to recall anything.

Thurston admitted that she initially had refused to testify and that she only agreed to do so when she learned there would be a warrant for her arrest if she did not appear in court. The prosecutor again asked Thurston if she

23

was afraid to testify. Thurston reiterated that her only fear was of getting arrested if she did not testify. The prosecutor then asked Thurston if her husband, a former Oakland police officer, had ever arrested Rich. There was an immediate defense objection, which the court sustained. The court immediately admonished the jury to disregard the last part of Thurston's statement "regarding any prior interaction with her husband."

### 3. Rich's Motion for a Mistrial

On May 10, 2018, Rich moved for a mistrial based on the prosecutor's questioning of Thurston as well as on her reference to witnesses in her opening statement who did not testify. As to the gang question posed to Thurston, the trial court denied the motion because there had not been a timely objection. The court tentatively denied the mistrial motion on the merits but allowed defense counsel further time to file a written motion.

After further briefing and argument, the trial court denied the mistrial motion.

### B. *Applicable Law*

A motion for mistrial is directed to the sound discretion of the trial court and should be granted if the court is apprised of prejudice it deems incurable by admonition or instruction. (*People v. Jenkins* (2000) 22 Cal.4th 900, 985–986.) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*Id.* at p. 986.) "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 372.)

24

"Unquestionably, the prosecution may in its opening statement refer to evidence which it believes will be produced. [Citation.]" (*People v. Barajas* (1983) 145 Cal.App.3d 804, 809.) Thus, "remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted." ' [Citation.]" (*People v. Wrest* (1992) 3 Cal.4th 1088, 1108; see *People v. Rhinehart* (1973) 9 Cal.3d 139, 154, disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213–214.)

"Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. [Citation.] Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 [citations] to the extent federal constitutional rights are implicated and *People v. Watson* (1956) 46 Cal.2d 818 [citations] if only state law issues were involved." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564; see *People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.) Under *Chapman*, prosecutorial misconduct that violates federal law is not prejudicial if the misconduct was harmless beyond a reasonable doubt. (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268–1269; *People v. Champion* (2005) 134 Cal.App.4th 1440, 1453.) Under *Watson*, prosecutorial misconduct that violates state law is not prejudicial " 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403; see *People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [prosecutorial misconduct is harmless "if it is not reasonably probable that a result more favorable to the defendant would have been reached in its absence"].)

C.    *Analysis*

    1.    Opening Statement

There was no prosecutorial misconduct here. First, it is quite clear from the record that at the time she made her opening statement, the prosecutor fully intended to call Maxine Doe and Tiffany Doe to testify to all of the facts mentioned in her opening statement. Before trial, the prosecutor informed the court and defense counsel of her intention to call both these witnesses. The prosecutor obtained an in limine ruling from the trial court allowing her to question Maxine Doe and Tiffany Doe. Rich does not dispute the factual accuracy of the prosecutor's opening statement; nor does he contend that the prosecutor made reference to any evidence that would have been inadmissible if Maxine Doe and Tiffany Doe had testified. Thus, the evidence the prosecutor outlined in her opening statement was not so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted. (*People v. Wrest, supra*, 3 Cal.4th at p. 1108.)

We also reject Rich's argument that the prosecutor's opening statement violated his federal constitutional rights to due process and a fair trial. Rich argues, "Regardless of the prosecutor's intentions, the use of facts not proven by evidence in opening statement had a large effect on the jurors' view of the actual evidence presented."

Although not cited by either party, *Frazier v. Cupp* (1969) 394 U.S. 731 is directly on point. There, the prosecutor's opening statement anticipated that a former codefendant would testify against the defendant. (*Id.* at p. 733.) The summary of the anticipated testimony was not emphasized by the prosecutor and "took only a few minutes to recite . . . ." (*Ibid.*) At trial the codefendant invoked his privilege against self-incrimination and was excused as a witness. (*Id.* at p. 734.) The jury was instructed that the opening

26

statement was not evidence. (*Id.* at p. 735.) Finding neither prosecutorial misconduct nor a constitutional violation, the high court first noted that the codefendant's statement "was not a vitally important part of the prosecution's case" and that under those circumstances the limiting instructions given were sufficient to protect the defendant's constitutional rights. (*Ibid.*) The court explained: "It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given. . . . [I]t does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial." (*Id.* at p. 736.)

Here, as in *Frazier v. Cupp, supra*, 394 U.S. 371, the prosecutor's opening statement was no more than an objective summary of the testimony she expected to receive from Tiffany Doe and Maxine Doe. The summary was not emphasized in any particular way; it took only a few minutes to recite and preceded the graphic presentation of the brutality Rich perpetrated against Tasha, Mia, and Shante. Also, the remarks concerning Tiffany Doe and Maxine Doe were not a crucial part of the prosecution's case, particularly in light of the solid eyewitness testimony of Barker, Tasha, Mia, and Shante. Moreover, the trial court repeatedly instructed the jury that statements of counsel, including opening statements, were not evidence; that the jury had to decide the facts based solely on the evidence; and that evidence was

limited solely to the testimony of the witnesses and the exhibits received. In these circumstances, we see no reason to depart from the usual assumption "that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial." (*Id.* at p. 736.) Accordingly, we conclude that Rich suffered no constitutional violations and no incurable prejudice arising from the prosecutor's opening statement.

> ### 2.      Questioning of Thurston

We also reject Rich's argument that the prosecutor engaged in prejudicial misconduct in her questioning of Thurston. Even assuming this issue were preserved for review, any error was harmless under state and federal standards. In this multiweek trial, with numerous victims recounting graphic acts of violence by Rich, we are hard-pressed to find resulting prejudice from two brief, albeit inflammatory, questions. The questions regarding Rich's purported gang membership and his prior arrest by Thurston's husband were not "so highly prejudicial that no admonition of the trial judge to disregard [them] could erase" them from the minds of the jurors. (*People v. Brophy* (1954) 122 Cal.App.2d 638, 652.) In denying the mistrial, the court explained that it did not give a particularized admonition regarding the gang question because defense counsel did not object when the question was asked and the court did not want to "draw attention to it all over again." As for the question regarding Rich's arrest by Thurston's husband, the court ordered it stricken from the record. The court then immediately admonished the jury "to disregard the last statement of the witness regarding any prior interaction with her husband. And that's based on the question. There was no answer by the witness." Although not a model of clarity, the admonition adequately instructed the jury to disregard the question. The trial court repeatedly instructed the jury that statements

made by the attorneys are not evidence, that a question is not evidence, and not to consider questions and/or answers that had been stricken by the court. Once again, we see no reason to depart from the usual assumption that the jury understood and followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *Frazier v. Cupp, supra*, 394 U.S. at p. 736.)

### 3. Cumulative Error

To the extent Rich argues that he was prejudiced by the "cumulative effect" of the prosecutor's opening statement and questioning of Thurston, this too is without merit. This was not a close case. The extensive evidence regarding Rich's criminal conduct was overwhelming. Contrary to his contention, we fail to see how the challenged conduct "made Rich appear worse in the eyes of the jury . . . ." The prosecutor's reference to two witnesses who did not testify and brief questions about Rich's possible gang involvement and prior arrest were mere drops in an ocean of evidence presented to the jury. On this record, there is simply no basis to find that the prosecutor's conduct, whether viewed individually or cumulatively, denied Rich a fair trial. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 [litmus test for cumulative error is whether defendant received a fair trial].)

## II. *Ability to Pay the Fines and Fees Imposed*

The trial court imposed a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), imposed and stayed a parole revocation restitution fine of the same amount (*id.*, § 1202.45), imposed a $250 probation investigation fee (*id.*, § 1203.1b), imposed a $520 court operations assessment (*id.*, § 1465.8, subd. (a)(1)), imposed a $390 criminal conviction assessment (Gov. Code, § 70373), and imposed a $300 sex offender registration fine (Pen. Code, § 290.3). The court also imposed a $300 probation revocation restitution fine (*id.*, § 1202.44) due to the fact that Rich's probation had been revoked in a prior

29

case.[4]  The court further ordered direct victim restitution (*id.*, § 1202.4, subd. (f)) in the amount of $1,681.54.  Rich argues that the case must be remanded because the trial court did not determine he had the ability to pay these fines and fees under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.

First, we will not consider any challenge to the trial court's order with respect to direct victim restitution under section 1202.4, subdivision (f). Although Rich mentions this award in his briefing, it is unclear that he is contesting it.  Courts addressing the issue "have distinguished between direct victim restitution that reimburses victims for economic losses caused by a defendant's conduct and the restitution fine imposed to punish the defendant" and have declined to extend the rule announced in *Dueñas* to direct victim restitution.  (*People v. Belloso* (2019) 42 Cal.App.5th 647, 658, fn. 8; see *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Evans* (2019) 39 Cal.App.5th 771, 777.)

Rich's *Dueñas* argument does not attempt to address this important distinction.  In fact, it provides no reasoned analysis of any kind with respect to the application of *Dueñas* to direct victim restitution.  We conclude that Rich has failed to raise the issue in a manner sufficient to warrant our appellate consideration.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [where no " 'legal argument with citation of authorities' " is furnished on a particular point, " 'the court may treat it as waived, and pass it without consideration' "].)

---

[4] Rich fails to mention this fee.  Although this fee is not referenced in the sentencing minute order or in the abstract of judgment, at the sentencing hearing the trial court imposed a "$300 probation revocation restitution fine in light of the fact that probation was revoked and found to be true, . . . pursuant to . . . section 1202.44."  As discussed in part IV, *post*, we shall order correction of the sentencing minute order and abstract of judgment.

Turning to the $10,000 restitution fine at issue, section 1202.4 requires the imposition of such a fine upon conviction of a crime, unless the court "finds compelling and extraordinary reasons for not doing so . . . ." (§ 1202.4, subd. (b).) The minimum restitution fine for felony convictions is $300, and the maximum fine is $10,000. (*Id.*, subd. (b)(1).) The statute expressly provides that "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.*, subd. (c).) However, "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (*Ibid.*) The burden of demonstrating such inability to pay lies with the defendant. (*Id.*, subd. (d); see *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay"].)

Here, Rich concedes he did not object to imposition of the fines and fees. In the wake of *Dueñas*, courts have taken varying positions on the issue of forfeiture. For example, in *People v. Johnson* (2019) 35 Cal.App.5th 134, another division of this court concluded the defendant had not forfeited a "present ability to pay" challenge to a "court security fee" (Pen. Code, § 1465.8), a criminal conviction assessment (Gov. Code, § 70373), and a restitution fine of $300, stating, "There is a well-established exception to the forfeiture doctrine where a change in the law—warranting the assertion of a particular objection, where it would have been futile to object before—was not reasonably foreseeable." (*Johnson*, at pp. 137–138.) The *Johnson* court concluded the holding in *Dueñas* was not reasonably foreseeable. (*Ibid.*; accord, *People v. Castellano, supra*, 33 Cal.App.5th at p. 489 ["When, as here, the defendant's challenge on direct appeal is based on a newly announced

31

constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture"].)

In *People v. Frandsen* (2019) 33 Cal.App.5th 1126, the appellate court reached the opposite conclusion. While acknowledging the exception to forfeiture where there has been a change in the law that was not reasonably foreseeable, the *Frandsen* court concluded *Dueñas* did not represent a "dramatic and unforeseen change in the law governing assessments and restitution fines . . . [because] [s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*Id.* at p. 1153.)

In *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, the appellate court found "it unnecessary to address any perceived disagreement on the forfeiture issue," explaining that both "*Castellano* and *Johnson* involved situations in which the trial court imposed the statutory *minimum* restitution fine." (*Id.* at pp. 1032–1033.) Here, as in *Gutierrez* and in *Frandsen*, "the trial court imposed the statutory *maximum* restitution fine." (*Id.* at p. 1033.) Under these circumstances, an objection clearly would *not* have been futile as trial courts are statutorily authorized to consider a defendant's inability to pay any restitution fine above the statutory minimum. (§ 1202.4, subds. (c) & (d).)

As the *Gutierrez* court observed, "even before *Dueñas*, a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge." (*People v. Gutierrez, supra,* 35 Cal.App.5th at p. 1033.)

32

Accordingly, we conclude that Rich forfeited any challenge to the restitution fine.[5] (See *People v. Smith* (2020) 46 Cal.App.5th 375, 394–395 [failure to object to imposition of maximum restitution fine on inability to pay grounds resulted in forfeiture of claim]; *People v. Gutierrez, supra*, 35 Cal.App.5th at pp. 1032–1033.)

Moreover, several courts have held that where a defendant does not object to imposition of the maximum restitution fine on grounds of inability to pay, such failure also forfeits claims of inability to pay the lesser criminal sum imposed for other fees and assessments. (E.g., *People v. Smith, supra*, 46 Cal.App.5th at p. 395; *People v. Gutierrez, supra*, 35 Cal.App.5th at p. 1033 ["As a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"]; *People v. Frandsen, supra*, 33 Cal.App.5th at p. 1154 ["Given his failure to object to a $10,000 restitution fine based on inability to pay, Frandsen has not shown a basis to vacate assessments totaling $120 for inability to pay"].) We agree. Unlike the defendant in *Dueñas*, Rich had a statutory right to an ability to pay hearing that he did not exercise, thus forfeiting his appellate claim that such a hearing was required. Had he requested such a hearing, the same evidence relevant to his inability to pay the $10,000 restitution fine could also have established an inability to pay these smaller assessments. We thus conclude that Rich has forfeited the opportunity to raise an ability to pay challenge with respect to the other fines, fees, and assessments imposed.

---

[5] Rich also forfeited the right to challenge the imposition of the sex offender registration fee. (§ 290.3, subd. (a).) That statute "authorizes the court to consider ability to pay, the court found he had the ability to pay, and he failed to object." (*People v. Gutierrez, supra*, 35 Cal.App.5th at p. 1033, fn. 12.)

Rich alternatively makes the passing argument that his trial counsel was ineffective for failing to preserve the inability to pay issue on appeal. "It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted.)

Rich's claim is without merit because we cannot determine from the record why counsel failed to request a hearing on his ability to pay. It is possible that Rich did have the ability to pay the fines and fees and that counsel made a rational decision not to raise the issue. That Rich qualified for appointed counsel does not necessarily mean that he cannot afford to pay the restitution fine and other fees and assessments imposed. Moreover, his claim that he suffers from a "disabling back injury" does not suggest that he is permanently disabled to such a degree that he will be ineligible for or unable to perform any prison work assignments.

Thus, in the absence of a record from which we could determine that Rich did not have the ability to pay the fines and fees imposed, Rich has failed to establish a reasonable probability that if counsel had raised the issue below he would have obtained relief. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) We therefore reject Rich's ineffective assistance claim.

## III. *Sentencing Modifications*

Rich contends his sentence regarding the ninth count (torture of Mia) must be stayed pursuant to section 654 because it is based on the same facts of the seventh and eighth counts (separate acts of forcible penetration of

34

Mia). The Attorney General concedes that the court erred and urges us to modify the sentence regarding the ninth count. The Attorney General also points out a sentencing error regarding the third count (sodomy of Shante), which Rich concedes requires correction.

A. *The Ninth Count (Torture—Mia Doe)*

Section 654, subdivision (a) admonishes that an act "punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act . . . be punished under more than one provision."

" 'Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct.' " (*People v. Pinon* (2016) 6 Cal.App.5th 956, 967, quoting *People v. Miller* (1977) 18 Cal.3d 873, 885.) "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry . . . . We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act . . . do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312.)

The statute prohibits separate punishment "for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove that element." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1044–1045.)

Here, as the Attorney General concedes, the prosecutor relied on the same facts to support the torture conviction (§ 206) in the ninth count

35

regarding Mia Doe[6] and the two convictions of forcible sexual penetration of a minor (§ 289, subd. (a)(1)(C)) in the seventh and eighth counts regarding Mia. As to the seventh count, the court imposed the upper term of 10 years, stayed that term (§ 654), and imposed a consecutive term of 25 years to life for an enhancement (§ 12022.7, subd. (a)). As to the eighth count, the court imposed the upper term of 10 years, stayed that term (§ 654), and imposed a consecutive term of 25 years to life for an enhancement (§ 667.61, subd. (m)). As to the ninth count, the court imposed a consecutive term of seven years to life.

As the term imposed for the ninth count is the lesser term, it should be stayed pursuant to section 654 because it was based on the same acts with the same intent based on the two separate incidents charged in the seventh and eighth counts. Rather than remand the case to the trial court, it is appropriate under these circumstances—where there is no discretion for the trial court to exercise—for this court to simply modify the judgment by ordering that the term for the ninth count be stayed. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473; *People v. Butler* (1996) 43 Cal.App.4th 1224, 1248 ["Where multiple punishment has been improperly imposed, ' . . . the proper procedure is for the reviewing court to modify the sentence to stay imposition of the lesser term' "].)

B.     *The Third Count (Sodomy—Shante Doe)*

The jury returned a verdict of guilty of forcible sodomy in the third count but found the enhancement allegations as to that charge "not true." As to the third count, the court imposed the upper term of eight years, stayed that term (§ 654), and imposed a consecutive sentence of 15 years to life

---

[6] The flatiron torture of Tasha Doe was separately charged in the thirteenth count.

36

based on the enhancement under section 667.61, subdivision (c).  The sentence based on the enhancement that the jury found not true was erroneous and unauthorized under the law.  (See *People v. Irvin* (1991) 230 Cal.App.3d 180, 190.)

When an appellate court becomes aware of an unauthorized sentence, the sentence should be corrected, even if it means a more severe punishment for the defendant.  (See *People v. Serrato* (1973) 9 Cal.3d 753, 765, disapproved on other grounds by *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1.)  Here, the 15-years-to-life enhancement for the third count was unauthorized and should be stricken.  The eight-year sentence for the third count that was stayed should be imposed, and the abstract of judgment and clerk's minutes should be corrected accordingly.  (See *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [no purpose served in remanding for reconsideration when trial court indicated its sentencing choices].)

## IV.  *Corrections to Sentencing Minute Order and Abstract of Judgment*

As the Attorney General notes, at the sentencing hearing the trial court imposed a one-year term for Rich's prior prison felony conviction (§ 667.5, subd. (b)) but did not stay that term.  The sentencing minute order reflects that this term was not stayed.  The abstract of judgment, however, reflects that this term was stayed.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; accord, *People v. Mesa* (1975) 14 Cal.3d 466, 471.)  Here, the oral pronouncement controls over the inconsistent and incorrect sentence set forth in the abstract of judgment.  Similarly, the sentencing minute order and the abstract of judgment must be corrected to accurately reflect the trial  court's

oral pronouncement of the "$300 probation revocation restitution fine . . . pursuant to . . .section 1202.44."

## DISPOSITION

The sentence is modified as to the ninth count (§ 206; torture) to stay the consecutive seven-years-to-life term pursuant to section 654. The sentence is further modified as to the third count (§ 286, subd. (c)(2)(A); forcible sodomy) to strike the 15-years-to-life enhancement (§ 667.61, subd. (c)), to strike the stay pursuant to section 654, and to impose the eight-year consecutive term. The abstract of judgment is modified to reflect that the one-year sentence for Rich's prior prison felony conviction (§ 667.5, subd. (b)) is not stayed. The abstract of judgment and the sentencing minute order are modified to reflect the $300 probation revocation restitution fine (§ 12022.44) imposed by the trial court.

The trial court is directed to prepare a corrected abstract of judgment and to correct the sentencing minute order dated June 29, 2018, in accordance with this disposition. The trial court is further directed to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.

A155040/*People v. Albert Earl Rich*